# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-257

**JOY MATURIN AND NORRIS MATURIN**

**VERSUS**

**BAYOU TECHE WATER WORKS, INC. ET AL**

\*\*\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, DOCKET NO. 127719
HONORABLE ANTHONY THIBODEAUX, DISTRICT JUDGE**

\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS
JUDGE**
\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge and Sylvia R. Cooks, and John D. Saunders, Judges.

**REVERSED and REMANDED.**

**THIBODEAUX, C.J., concurs in the result.**

Jacques Soileau
P.O. Box 344
Breaux Bridge, LA 70517
(337) 412-2044
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Joy Maturin and Norris Maturin

Gordon J. Schoeffler
P.O. Box 4829
Lafayette, LA 70502
(337) 234-5505
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Joy Maturin and Norris Maturin

Joseph R. Roy, III
P.O. Box 4929
Lafayette, LA 70502
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Joy Maturin and Norris Maturin
Wayne R. Maldonado

**John C. Henry**
**3850 North Causeway Blvd., Ste. 1280**
**Metairie, LA  70002**
**(504) 836-7554**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
>     **Bayou Teche Water Works, Inc. and**
>     **American Alternative Insurance Company**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Joy Maturin (Joy) and her husband Norris Maturin (Norris) have lived along Bayou Teche in the rural area near St. Martinville, Louisiana for the last thirty-two years. Bayou Teche Water Works, Inc. (BTWW) has supplied water to the Maturins and approximately 9,000 other residents in their service area from St. Martinville to New Iberia, Louisiana for nearly all of that time. When BTWW was established all residents within its service district were required by state law to cease using their own private water wells and to connect to BTWW's service lines. BTWW is the sole provider of water for approximately 3,100 businesses and residences in the service area. Each customer of BTWW is a member of this cooperative, non-profit corporation, and each member enjoys the right to vote to select its board members and to attend board meetings.

Joy and Norris allege they and all other customers of BTWW have experienced water problems with the water supplied by BTWW for many years including, brown, smelly, discolored water, "corrosive and repulsive" water containing sediment and unidentifiable particulate matter some of which are allegedly cancer-causing agents. The Maturins allege the water supplied by BTWW has "continually and consistently had excessive amounts of chlorination disinfection byproducts, including TTHM [(total trihalomethanes)] and HAA5 [(haloacetic acids five)], well in excess of the statutory Maximum Containment Levels (MCLs)" and that these violations "pose serious health risks, including but not limited to problems with the liver, kidneys, central nervous system, and cancer."[1] They also allege the

---

[1]     Plaintiffs filed a stipulation "which shall have the effect of a judicial admission, confession, and stipulation of fact and law" that states:

> [T]he claims they have asserted in the instant suit do not include any claims for personal injury, illness, physical pain and suffering, or medical expenses caused by the water made the subject of this litigation, and/or BTWW's acts, omissions, or

water supplied by BTWW "has fouled household filtration systems and machines that use the water, for example, washing machines, hot water heaters, etc., and other household items to the extent that they have to be replaced in minimal periods of time, well short of their normal useful life." Additionally, the Maturins allege the water is not fit for use in cooking or for drinking and that they and the other customers of BTWW have for years had to purchase bottled water and ice. They further allege that the long-term use of the water supplied by BTWW has exposed its customers to the fear of personal injuries and/or serious illness.

Norris has for many years worked for a neighboring water company, Louisiana Water Company (LAWCO), and is professionally knowledgeable about water quality. After enduring years of poor water quality, incurring monthly expenses for clean water to use for drinking and cooking, the Maturins confronted BTWW about the water problems. Norris offered possible solutions, but BTWW was not interested in Norris' suggestions nor his complaints. Being knowledgeable on how to enlist the State's assistance with the problem, Norris and Joy formally requested help from the Public Service Commission. The matter was transferred to the Louisiana Department of Health and Hospitals (DHH) for investigation. During the course of this investigation Joy and Norris personally visited some 960 fellow consumers and obtained their signatures on a petition to have "a new privately owned water company take over operations and maintenance of the Bayou Teche Water District and provide potable water for the district." The nearby competitor,

_____

negligence as complained of in the Petition or any future amendment thereto. Plaintiffs expressly reserve any and all claims for fear of contracting illness/personal injuries as a result of their use and consumption of the subject water, as alleged in their Petition. Any reference to "bodily injury" as alleged in the Petition refers expressly and only to such fear of illness/personal injury as a result of use and consumption of the subject water.

LAWCO, and BTWW discussed the prospect of such a takeover but LAWCO ultimately decided it was too costly because of the changes which would have to be made for it to become the provider of BTWW's customers.

DHH's investigation found that the water being supplied by BTWW was not in compliance with state health standards. The deficiencies included unacceptable levels of disinfectant by-products in the water and BTWW was cited for thirteen violations "which the state health officer [] determined ma[de] the system incapable of attaining compliance with 40 CFR 141 and 40 CFR 142.16(b)." DHH ordered BTWW to bring its water quality into compliance with Louisiana's state health standards by taking thirty outlined remedial actions within a prescribed time frame.

On April 13, 2016, the present suit was filed by Joy and Norris Maturin "individually and on behalf of all others similarly situated" against BTWW for damages resulting from years of poor water quality. On October 23, 2017, DHH issued its determination that BTWW had complied with the required remedial actions ordered by the state.

The Maturins filed a Motion to Certify as a Class Action and to appoint Joy and Norris as representatives of the Class. Several witnesses, including Joy, Norris and other customers testified at the hearing. Clay Paul Peltier, Jr. (Peltier) testified that he had to install a "complete house" water filtration system and water softener at a cost of four thousand dollars because of the brown smelly water. When he was a customer with LAWCO he had clear water that did not smell bad and he immediately noticed the difference when he became a customer of BTWW. Peltier testified he installed the water system because of the discolored smelly water and because of "health concerns." He testified that he "lost a neighbor to pancreatic cancer." Peltier says he and his wife do not drink the water provided by BTWW and do not cook with it. In addition to their filtration system, they purchase bottled water

3

monthly for drinking and cooking needs. When asked about the present quality of water being provided by BTWW Peltier responded "Well, I have a complete system. So, I don't know. You know, it's filtered and conditioned, so it's working now." He further explained that he did not feel it should have been necessary for him to incur these expenses because "we're paying for water and we're not getting something that we can trust."

Ovey Viator (Viator) also testified as a customer serviced by BTWW regarding his experience with brown, smelly water. Viator testified that on one occasion he filled a clear plastic bottle with the discolored brown water and took a photograph to show the sample to BTWW. When asked why he did this he responded "Turning brown, yes, sir, just to show the people. And I went show Bayou Teche Water Works, but they didn't say nothing, you know." Viator says BTWW never contacted him regarding his complaint. Viator further testified that he recalls the water being very discolored in 2013, 2014, and 2015.

Q. Did the discoloration cause you any trouble, say, with your bath tub?

A. Yes sir. It turned brown, brown, you know.

Q. In your bath tub?

A. Yes, sir.

Q. You couldn't bathe in it?

A. No, sir.

Q. So how would you bathe?

A. At first, I'd buy them gallons of water, and then we'd heat up some water to make it warm up, you know. And then, after a couple of days, we noticed, let the water run like for about ten minutes, fifteen minutes, and it would get kinda, you know, clear, you know. And then we'd take a shower, you know.

Q. Now did it affect your toilets?

A. Yes, sir, two toilets. It turned, like, brown. We'd clean it. But after you'd clean it, it still had like a little brown film around it, you know.

Q. Did you have to replace the toilet?

A. Yes, sir. I replaced two toilets.

Q. Two toilets?

A. And a washer.

Q. Okay. Now you replaced the two toilets because of the brown water and the staining?

A. Yes, sir.

Q. And you replaced the washing machine?

A. Yes sir.

Q. And why did you replace the washing machine?

A. Because, like in November or December, we would still wash, but like the clothes, it was turning like a brownish color, you know.

Q. Would it do anything else in your washing machine to your clothes?

A. Yeah, it would turn brown. My clothes would turn brown, and then it would leave like a film in the washing machine, you know.

Q. Now, when your clothes would turn brown, could you get the stain out?

A. No, sir. We had to go back and buy t-shirts. So then we bought colorful t-shirts.

. . . .

Q. Now, did you have to get another washing machine?

A. Yes, sir. I bought a new washer.

. . . .

Q. Did—was there any smell to the water?

. . . .

A. Oh, it smelled almost like a skunk, you know.

Viator testified that he too, started using bottled water after seeing the brown water because he was concerned for his health. When asked why he was afraid the water would make him sick he responded "It's just like when the paper came out, when they said cancer, you know. And I had cancer, and then my wife dies with cancer, you know. That's why I still drink bottled water right now, you know."

Catherine West Jackson, a retired teacher, also testified. She, too, experienced brown discolored water at her home serviced by BTWW and she too uses a whole house water filtration system because of her concern that the water supplied by BTWW might cause her health problems.

At the close of Plaintiffs' presentation BTWW moved for a directed verdict dismissing the Motion for Class Certification. Despite finding the Plaintiffs proved to the trial court's satisfaction that the matter would best be addressed as a class action the trial judge concluded that Joy and Norris had a conflict of interest adverse to the potential class members and could therefore not be certified as class representatives. Based upon that conclusion the trial court granted the directed verdict dismissing the motion for class action.

The Maturins appeal the trial court ruling alleging three assignments of error.

(1) The trial court erred in its application of LSA-C.C.P. art. 591(A)(4) to the record evidence in the case sub judice, leading to the erroneous legal conclusion that Joy & Norris Maturin do not adequately represent the interests of similarly situated putative class members.

(2) The trial court erred in concluding that its findings merit complete denial of class certification, where besides the adequacy concerns raised, all other criteria for class certification were met.

(3) The trial court erred in admitting irrelevant & prejudicial evidence related to Norris Maturin's employment with LAWCO; and further in precluding rebuttal evidence to that irrelevant LAWCO evidence.

6

**Legal Analysis**

In *Cajuns for Clean Water, LLC v. Cecelia Water Corp.*,18-185 (La.App. 3 Cir. 10/3/18), 257 So.3d 706, 714, *writ denied*,18-1789 (La.1/14/19), 261 So.3d 787 this court addressed a similar class action suit against a water district noting:

> The Louisiana State Supreme Court, in *Baker*, 167 So.3d at 537 (emphasis added, footnote omitted) held:
>
>> The only issue to be considered by the trial court when ruling on certification, and by this Court on review, *is whether the case at bar is one in which the procedural device is appropriate.* In determining the propriety of such action, **the court is not concerned with whether the plaintiffs have stated a cause of action or the likelihood they ultimately will prevail on the merits**, but whether the statutory requirements have been met. *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974).

We further noted in *Cajuns for Clean Water* "[t]he supreme court has made clear 'any errors to be made in deciding class action issues should be in favor of and not against the maintenance of the class action.' *McCastle v. Rollins Environmental Services of Louisiana, Inc.*, 456 So.2d 612, 618 (La. 1984)." *Supra*. at 706.

In the present case, we are called upon to determine the correctness of the trial court's granting a directed verdict. Thus, we must apply the standard of review for making that determination. In doing so, however, we must also examine the applicable substantive law for determining the propriety of a trial court's ruling certifying or refusing certification of litigation as a class action proceeding.

The trial court granted BTWW's motion for directed verdict at the close of Joy and Norris' presentation of evidence but before BTWW put forth any evidence in defense of its objection to class certification. Louisiana Code of Civil Procedure Article 1810 (emphasis added) sets forth the motion for directed verdict in jury trials:

> *A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do*

*and to the same extent as if the motion had not been made*. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

Joy and Norris did not object to Defendants' use of the motion for directed verdict but simply stated on the record that the judge should not grant a directed verdict because they had met their burden of proof. On appeal, Plaintiffs assert in brief it was not procedurally proper for the judge to issue a directed verdict in this non-jury proceeding. Plaintiffs did not preserve this issue for appeal.[2] However, regardless of whether Defendants' motion could properly be brought under La.Code Civ.P. art 1810 in this hearing, we find the court erred in granting the directed verdict dismissing Plaintiffs' motion. "On review of a directed verdict, an appellate court considers the evidence presented and determines whether reasonable persons could have arrived at a contrary verdict." *Chenevert v. Hilton*, 07-1223, p. 8 (La. App. 3 Cir. 3/5/08), 978 So.2d 1078, 1085, *writ denied*, 08-731 (La. 5/30/08), 983 So.2d

---

[2] It is well-settled law that failure to make formal objections to a ruling of the trial judge results in a waiver of a party's right to urge those objections as error on appeal. *Nunnery v. City of Kenner,* 08–1298 (La.App. 5 Cir. 5/12/09), 17 So.3d 411, 415, citing La. C.C.P. art. 1635. Our review of the record reveals that plaintiffs did not object to defendants' motion for directed verdict or to the trial court's ruling thereon, on the procedural ground that the motion was untimely.

. . . .

Because plaintiffs made no objection at trial to the timeliness of defendants' motion for directed verdict or to the trial court's ruling thereon, the alleged error is waived and not properly before this Court on appeal.

*Baudy v. Travelers Indem. Co. of Connecticut*, 13-832 (La.App. 5 Cir. 4/9/14), 140 So.3d 125, 129–30.

901(citations omitted). *"A directed verdict is appropriate only when the evidence overwhelmingly points to one conclusion." Hebert v. BellSouth Telecommunications, Inc.,* 01–223, p. 7 (La.App. 3 Cir. 6/6/01), 787 So.2d 614,619 (emphasis added).

> A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. *McNeely v. Ford Motor Company, Inc.,* 98-2139 (La.App. 1st Cir.12/28/99), 763 So.2d 659, 664, *writ denied,* 2000–0780 (La.4/28/00), 760 So.2d 1182. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. *Pratt v. Himel Marine, Inc.,* 2001-1832, p. 17 (La.App. 1st Cir.6/21/02), 823 So.2d 394, 406, *writs denied,* 2002-2025, 2002-2128 (La.11/1/02), 828 So.2d 571, 572.

> However, if there is substantial evidence opposed to the motion, *i.e.,* evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. *Pratt,* 2001-1832 at pp. 17-18, 823 So.2d at 406. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. Legal sufficiency of the evidence challenges, such as those presented by motions for directed verdicts, are reviewed on appeal *de novo. Hall v. Folger Coffee Company,* 2003-1734, p. 10 (La.4/14/04), 874 So.2d 90, 99.

*Wright v. Bennett*, 04-1944, pp. 15-16 (La.App. 1 Cir. 9/28/05), 924 So.2d 178, 187-88.

The substantive law underpinning Joy and Norris' assertion that this litigation should proceed as a class action is set forth in La.Code Civ. P. art 591.

A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:

(1) The class is so numerous that joinder of all members is impracticable.

(2) There are questions of law or fact common to the class.

(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.

(4) The representative parties will fairly and adequately protect the interests of the class.

(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case. This prerequisite shall not be satisfied if it is necessary for the court to inquire into the merits of each potential class member's cause of action to determine whether an individual falls within the defined class.

B. An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Article are satisfied, and in addition:

(1) The prosecution of separate actions by or against individual members of the class would create a risk of:

(a) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(b) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The matters pertinent to these findings include:

(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;

(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c) The desirability or undesirability of concentrating the litigation in the particular forum;

(d) The difficulties likely to be encountered in the management of a class action;

(e) The practical ability of individual class members to pursue their claims without class certification;

(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation; or

(4) The parties to a settlement request certification under Subparagraph B(3) for purposes of settlement, even though the requirements of Subparagraph B(3) might not otherwise be met.

C. Certification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class. However, following certification, the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to a member of the class.

These elements are typically referred to by our courts as numerosity, commonality, typicality, adequate representation, and definability, all of which must be satisfied to maintain a class action.

> The trial court's decision to certify a class action is a two-step process. The trial court must first determine whether a factual basis exists for class action certification. If the trial court finds that a factual basis exists for certification, it then must exercise its discretion in deciding whether to certify the class. Appellate review must therefore consist of a two-part analysis. The trial court's factual findings in the first step of certification are subject to review under the manifest error standard. The trial court's ultimate decision regarding certification is then reviewed under the abuse of discretion standard. *Mire v. EatelCorp, Inc.,* 02-1705, p. 3 (La.App. 1st Cir.5/9/03), 849 So.2d 608, 612, *writ denied,* 03–1590 (La.10/3/03), 855 So.2d 317. The appellate courts will only decertify a class where there is an abuse of the trial court's vast discretion. *Banks v. New York Life Insurance Company,* 98-0551, p. 6 (La.12/7/98), 722 So.2d 990, 993-94.

> The trial court has much discretion in deciding whether a suit should be certified as a class action. *Carr v. Houma Redi-Mix Concrete Company, Inc.,* 96–1548, p. 3 (La.App. 1st Cir.11/10/97), 705 So.2d 213, 215, *writ denied,* 98-0743 (La.5/1/98), 718 So.2d 416. In reviewing a trial court's exercise of its discretion in certifying a class action, an appellate court should bear in mind the supreme court's jurisprudential admonition to trial courts to err on the side of caution, in favor of maintaining the class action:

> > *[I]f there is to be an error made, it should be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments*

11

> *during the course of the trial so require. [Citations omitted.]*

*McCastle v. Rollins Environmental Services of Louisiana, Inc.,* 456 So.2d 612, 620 (La.1984).

> . . . .
>
>     The party seeking to maintain the class action bears the initial burden of *prima facie* proof of these elements. *Brumfield v. Rollins Environmental Services (LA), Inc.,* 589 So.2d 35, 37 La.App. 1st Cir.1991). In determining whether these elements have been established, the court may consider the pleadings, affidavits, depositions, briefs, exhibits, and testimony presented at a certification hearing. *Singleton v. Northfield Insurance Company,* 01-0447, p. 9 (La.App. 1st Cir.5/15/02), 826 So.2d 55, 62, *writ denied,* 02-1660 (La.9/30/02), 825 So.2d 1200.

*Boyd v. Allied Signal, Inc.,* 03-1840, pp. 8-10, (La.App. 1 Cir. 12/30/04), 898 So.2d 450, 456-57, *writ denied*, 05-191 (La. 4/1/05), 897 So.2d 606 (emphasis added).

Additionally, we note that class certification is a purely a question of whether it is preferable in this case to proceed as a class action and this decision has nothing to do with the merits of the case or whether Plaintiffs state a cause of action. Appellate courts review the propriety of the trial court's ruling on this issue with these principles in mind. In the present case the trial court determined that the evidence put forth by Plaintiffs established numerosity, commonality, and definability. No one appealed those findings thus we consider these elements have been established. In its reasons for judgment the trial court explained why it found numerosity is satisfied in this case:

> I've heard evidence that there were 3,230 service connections with Bayou Teche Waterworks. Three thousand, two hundred and thirty service connections. Of that, roughly 9,060 customers. I've heard evidence of discolored water, of high rust content water with the reports and the testimony in evidence. That's about the MCL, the effects of it on the discoloration, the residue left behind by water in the bathtubs and sinks, what happens when you wash your clothes. White clothes, in particular, they came out to be rusty water. People having to purchase bottled water at $15.00 to $20.00 per month. All of these people were customers of Bayou Teche Waterworks during the relevant periods that we discussed. Potentially, that's 9,060 customers. And if

12

that many claims were filed that's going to be in this court, that's going to be hard to do. I don't know if the system is set up for that. So I think the numerosity issue is satisfied, that a joinder of all members is impracticable.

Our review of the record finds this conclusion fully supported. Based on the uncontradicted evidence put forth by Plaintiffs numerosity is satisfied.

The trial court also found commonality is established and in its reasons for judgment stated:

> There are questions of law or facts common to the class. I haven't been briefed on any questions of law, but I suppose that the standard 2315 article would be controlling, and we could go from there.

> Questions of fact are common to the class, I'm sure, with regard to liability, okay, not with regard to damages. The reports show that there were high concentrations of chemicals in the water that were unhealthy. The reports, I know the evidence shows that there was a discoloration, there was a smell, there was corrosive lines or lines that were corroded, probably. I haven't determined that. It could be particular to the water or the chemicals in the water. That would be internal lines of the residences and the appliances that are there. It's not going to be that hard to determine, I don't believe, and ya'll haven't presented a full case on that yet. I look forward to seeing that. But I think the question of fact with regard to causation and liability are common to the class.

> With regard to damages, probably there's going to be some people suffered some damages whereas others haven't, but you get that in a class certification. Courts are used to dealing with that. There's plenty of cases that address that. We can handle that. So, the questions of law or fact common to classes is satisfied.

Again, we find the record fully supports this conclusion.

The trial court further concluded definability of the class is satisfied stating in its reasons for judgment:

> Class is or [may] be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in this case. I agree with that … I think one judge making one finding of all of these cases at one time would be the right thing to do. I think you satisfied that element.

Our review of the record supports this conclusion and we too, believe this element is fully satisfied.

On the issue of typicality, the trial court expressed its uncertainty with Plaintiffs having satisfied this element because, it reasoned, that "the suit is made for fear of cancer" and "neither Maturin satisfied me with their testimony that there is a fear in their house and that they fear cancer." This reasoning was off the mark. The suit claims a variety of damages and does not limit recovery to damages caused by the fear of developing cancer or other illnesses from years of using BTWW's water. The trial court recognized, as do we, that the claims of the Maturins and the other customers who testified are typical of all BTWW's customers. They all used the same water and experienced varying degrees of problems and incurred various expenses in working around the poor water quality for years. We find when considered under the standard for reviewing the propriety of this directed verdict, which directs that we view the evidence presented in a light most favorable to the Maturins, we conclude that "reasonable persons could have arrived at a contrary [finding]," *Chenevert,* 978 So.2d at 1084, and we certainly do not find that the "evidence overwhelmingly points to [only the] conclusion [reached by the trial court]." *Hebert*, 787 So.2d at 614. The trial court itself was equivocal on this point, and Plaintiffs' uncontroverted evidence, including the testimony of their fellow consumers that we have chronicled above, at this stage certainly shows that reasonable persons could easily conclude that the majority of claims made by the Maturins are typical of the majority of claims of the putative class members.

The last element to be satisfied is whether the Maturins can adequately and fairly represent the interests of the class. Despite recognizing Norris' special knowledge concerning water quality based on his years of experience working for a competitor company, and despite recognizing the Maturins' "heroic" efforts to help

their fellow Co-op members in seeking a solution to their longstanding issues with the poor water quality provided by BTWW, the trial court erroneously concluded that Joy and Norris had a conflict of interest in representing the class because Norris works for a competing water supplier. To add insult to injury, the trial court would not allow the Maturins to introduce the deposition testimony of Mr. William E. Edrington, President of LAWCO, but then referred to a small part of that testimony in support of its finding. We find it was not only error to refer to only a portion of the testimony, but it was compounded error to exclude the whole deposition testimony in the first instance.

> The proper inquiry for determining whether a party was prejudiced by a trial court's alleged erroneous ruling on the admission or denial of evidence is whether the alleged error, when compared to the entire record, had a substantial effect on the outcome of the case. If the effect on the outcome of the case is not substantial, reversal is not warranted. LSA-C.E. art. 103(A). The party alleging prejudice by the evidentiary ruling of the trial court bears the burden of so proving. *Emery v. Owens–Corporation,* 2000-2144, p. 7 (La.App. 1st Cir.11/9/01), 813 So.2d 441, 449, *writ denied,* 2002–0635 (La.5/10/02), 815 So.2d 842. Generally, the trial court is granted broad discretion in its evidentiary rulings and its determinations will not be disturbed on appeal absent a clear abuse of that discretion. *Turner v. Ostrowe,* 2001-1935, p. 5 (La.App. 1st Cir.9/27/02), 828 So.2d 1212, 1216, *writ denied,* 2002-2940 (La.2/7/03), 836 So.2d 107.

*Wright v. Bennett*, 04-1944, pp. 6-7, (La. App. 1 Cir. 9/28/05), 924 So.2d 178, 182-83.

Edrington's testimony was relevant to the trial court's determination that Norris, and somehow Joy too, have a conflict of interest that bars them from being the class representatives.

> Louisiana Code of Evidence Article 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." While relevant evidence is generally admissible pursuant to Article 402, it may "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403. A trial court's determination as to the relevance and admissibility of evidence will not be disturbed on appeal absent an abuse of discretion. *Johnson v. First Nat. Bank of Shreveport,* 00–870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, *writ denied,* 01–2770 (La.1/4/02), 805 So.2d 212, *writ denied,* 01–2783 (La.1/4/02), 805 So.2d 213.

*Chenevert, 978* So.2d at 1085.

We find there is no evidence in the record that would reasonably lead to the conclusion that Norris, much less Joy, would be compromised in representing the class simply because Norris works for a neighboring water company. To the contrary, we believe the fact that Norris is so experienced in the industry will provide testimony beneficial to a fair resolution of the issues which may surface in the litigation. Additionally, as the trial court noted, Norris and Joy have thus far put forth "heroic" efforts to rectify the water quality problems plaguing these consumers for decades. We further note, as a result of Joy and Norris' efforts investigations were conducted which led to corrections in the contamination problem. The litany of damages outlined in the Plaintiffs' suit, which are alleged to have occurred over decades of using this water, include damages which are no doubt common to all users of BTWW's service and it is the Maturins to date who have championed the cause for their fellow Co-op members. A review of the proffered testimony reveals no collusion or *quid quo pro* between LAWCO and Norris, much less between LAWCO and Joy. The suit does not seek to have LAWCO pronounced as the new supplier nor could any court grant such relief. Moreover, Edrington testified in his proffered testimony that Norris' employment has nothing to do with the bringing of this action against BTWW save for the fact that Norris knows bad water when he sees and tests it. He further stated that LAWCO "has no interest [in the outcome of this suit] other than we do not like to see any water company be in a lawsuit," adding "I would certainly pull for the big guy, the water company." When asked if LAWCO

had any "financial, or legal, or any other sort of formal interest in the outcome of this litigation" he responded, "None whatsoever." And, when asked if there is any attempt by LAWCO "to try and obtain Bayou Teche's water system" he responded "No…[it's not feasible] without changing rates."

As noted, Norris' experience and knowledge may prove to be an asset in understanding the issues in this suit in a way uniquely advantageous to the putative class members. The proffered testimony also became relevant when the trial court decided to base its decision concerning Norris and Joy as class representatives on the defense's conspiracy theory, which is roundly debunked by the proffered testimony, along with Norris and Joy's testimony. The erroneous ruling to exclude the proffered testimony prejudiced the Maturins as it had a substantial impact on the trial court's decision to refuse their request to be named class representatives. In fact, the trial court's decision on this question was based entirely on the alleged "conflict of interest."

Conclusion

We find the directed verdict was improvidently granted and we reverse that ruling. Louisiana Code of Civil Procedure Article 1810 expressly provides that a party moving for a directed verdict at the close of a plaintiff's case "may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made." The motion for directed verdict was made at the close of Plaintiffs' case before Defendants put forth any evidence, thus we do not have a complete record upon which we could exercise our full authority to render a decision on the merits of Plaintiffs' motion for class certification. For these reasons we must remand the case for further proceedings. See, *Hebert v. BellSouth Telecommunications, Inc.,* 01-223 (La.App. 3 Cir. 6/6/01), 787 So.2d 614, 619, *writ denied*, 01-1943 (La.10/26/01),

17

799 So.2d 1145 and *Bernard v. Ferrellgas, Inc.*, 96-621 (La.App. 3 Cir. 2/5/97), 689

So.2d 554.  All costs of this appeal are assessed against Bayou Teche Water Works,

Inc.

      **REVERSED AND REMANDED**